RENDERED: JULY 14, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1203-MR

JOSEPH MICHAEL GOATLEY; AND
CLASS A LAWN AND LANDSCAPE, INC.                    APPELLANTS


                    APPEAL FROM JEFFERSON CIRCUIT COURT
v.                  HONORABLE ERIC J. HANER, JUDGE
                    ACTION NO. 16-CI-006391


RAYMOND CHARLES BISCHOFF                                APPELLEE



OPINION
AFFIRMING

** ** ** ** **

BEFORE: THOMPSON, CHIEF JUDGE; ECKERLE AND LAMBERT, JUDGES.

ECKERLE, JUDGE: The seminal issue in this case is whether punitive damages were rightly assessed against a person who refused for many years to return a muscle car to its rightful owner after repeated demands. Finding no error, we affirm.

## BACKGROUND

The litigation in this case spans almost seven years and culminated in a bench trial where the Trial Court ordered the return of a vintage car and its parts to its owner and further assessed $15,000.00 in punitive damages against the tortfeasor. There are two issues raised on appeal: (1) whether awarding punitive damages was erroneous; and (2) whether proposed findings of fact and conclusions of law should have been stricken for citing to an unofficial transcript rather than the official video record.

The Trial Court's Findings of Fact, Conclusions of Law, and Judgment contain significant factual findings. Neither party disputes those findings on appeal; thus, we reproduce them here, omitting certain details that are not essential to the claims on appeal, and altering the formatting and removing citations for readability:

> Raymond Charles Bischoff (hereinafter "Bischoff") is a retired real estate investor and Vietnam veteran. Joseph Michael Goatley (hereinafter "Goatley") is a landscaper and owner of Class A Lawn and Landscaping ("Class A").
>
> When Bischoff was eighteen years old, he purchased a 1966 SS Super Sport, 398 Chevelle muscle car ("1966 Chevelle SS"). After being honorably discharged from the military, Bischoff began restoring cars and accumulating engines and automobile parts for his 1966 Chevelle SS. He stopped driving the 1966 Chevelle SS around 1974, when the car had approximately 47,000 miles on it; he kept the car so that he could restore it one

day. He later purchased a 1967 Chevelle and held onto both vehicles for his entire adult life while accumulating parts that could be used to restore the vehicles. Bischoff experienced difficult economic times when the recession hit in 2008, finding himself unable to make timely payments on his various real estate investments. Bischoff had borrowed money against his family farm in order to invest in real estate and found himself facing foreclosure of the farm. Bischoff had stored his 1966 Chevelle SS, 1967 Chevelle, and their accompanying parts (the "Property") on the family farm for years.

Bischoff's friend of more than 20 years, Edward Neutz ("Mr. Neutz"), owns a moving and storage company. At the time Mr. Neutz discovered Bischoff's family farm was being foreclosed on, Mr. Neutz offered to store Bischoff's vintage cars, the 1966 Chevelle SS and the 1967 Chevelle, for free. Bischoff did not accept his friendly favor from Mr. Neutz because Goatley had already offered to help him store the Property at Class A.

Goatley and Bischoff have been friends for years. Goatley has a hobby of buying, fixing up, and restoring muscle cars; a hobby that started as a father and son activity when Goatley was a high school student. Goatley focuses on cars made during the "muscle car era," between 1962 and 1972. Goatley has had a particular interest in the 1966 Chevelle because it was the car his father owned when his mother was pregnant with him. Goatley wanted to restore a 1966 Chevelle with his father.

Mike McDonald ("Mr. McDonald"), a friend of both Bischoff and Goatley, told Goatley about Bischoff's foreclosure predicament and his two vintage cars. Goatley knew Bischoff was experiencing financial difficulty when his family farm was being foreclosed on, stating, "I'm sure he was under duress and stress at that time." Mr. McDonald communicated between Bischoff

and Goatley regarding storage of the Property; in fact, he testified that Goatley "helped" Bischoff.
Goatley's personal motivation for agreeing to store Bischoff's Property was for the "opportunity to own the 1966 Chevelle SS." Bischoff's 1966 Chevelle SS piqued Goatley's interest. However, Goatley agreed to store Bischoff's property before telling Bischoff that he was interested in owning the 1966 Chevelle SS; Goatley offered to purchase the vehicle for $30,000 when he was on Bischoff's farm after already volunteering to help him move his Property, but Bischoff refused to sell. Goatley knew Bischoff was not ready to sell.

Bischoff instead told Goatley that he would be the first person he spoke to if he became interested in selling the 1966 Chevelle SS. Bischoff never agreed to trade, sell, or convey his 1966 Chevelle SS to Goatley in exchange for storing his Property, and never acknowledged any such agreement. Bischoff was only willing to give Goatley the opportunity to purchase the vehicle once he had it restored and was ready to sell it.

Goatley admitted he never told Bischoff he would charge him for storing his property or sent Bischoff an invoice for storage.

Bischoff had an offer from his friend, Mr. Neutz, to store his Property for free when his farm was being foreclosed on. Bischoff believed Goatley was similarly helping him out as a friend by storing his Property. Goatley never told Bischoff he intended to charge him for storage, in trade or otherwise. Bischoff testified he would not have stored his Property with Goatley if there was going to be a charge for doing so, or if he had to give Goatley his 1966 Chevelle SS in exchange.

Goatley never introduced evidence of any negotiated terms supporting the existence of the alleged verbal promise by Bischoff, such as the amount of rental fees, the method of payment, the term of storage, the size of

-4-

the warehouse or storage facility agreed upon, or access to the stored items. Goatley failed to prove that Bischoff owed him any sum of money for storing his Property because there was no verbal or written contract for Bischoff to compensate Goatley and Class A for storage.

Mr. McDonald, along with Goatley and several other men, helped move Bischoff's Property from the farm to Class A over multiple days as a friendly favor to Bischoff. Donald Gray Browning ("Mr. Browning"), a decades-long friend of Goatley, also helped move Bischoff's Property for a couple of days, alongside other workers.

While storing Bischoff's Property, Goatley had, on multiple occasions, sought Bischoff's permission to use or sell certain items of Property. Goatley recognized the Property was not his to give away, sell, or let another person use. Goatley admitted that Bischoff is the rightful owner of all the Property stored at Class A. Goatley knew Bischoff had not conveyed him the title to any of his Property, including the 1966 Chevelle SS, understanding Bischoff only gave him the title to that vehicle "to hold in safekeeping."

[In 2016,] Bischoff made repeated texts, phone calls, and faxes, attempting to coordinate the return of his Property from Goatley and Class A for a period of more than six months. During this time, when it became clear that Goatley did not intend to return the 1966 Chevelle SS, Mr. Neutz called Goatley to serve as an intermediary. Goatley told Mr. Neutz he would not return the 1966 Chevelle SS but would purchase it for $30,000 because the engine block and VIN number matched the vehicle.

After more than six months of unsuccessful attempts to communicate, Bischoff contacted local law enforcement for assistance. Goatley had avoided Bischoff and refused to talk to him. Bischoff felt he had no other choice but to call the police to get his property back.

Goatley was across town and not present when Bischoff went to Class A with a police officer to collect his Property. The police officer spoke with a Class A employee, Rebecca Chandler ("Ms. Chandler"), who called Goatley, to request Bischoff's Property. The only statement Bischoff made to Ms. Chandler was that he wanted to get his belongings. Despite his efforts, Goatley and Class A refused to allow him to get his property. Ms. Chandler said she "couldn't allow" Bischoff to collect his Property because she "never lets anyone touch anything on the property without Mr. Goatley's approval." Ms. Chandler instead wrote down the number to Goatley's attorney. The police officer then told Bischoff, "Here, she talked to him on the phone and need to call him up, talk to him." Bischoff followed the police officer's suggestion and sought legal counsel and filed this lawsuit. It was only after Bischoff filed this lawsuit, and after Bischoff's counsel had deposed Goatley, that Goatley agreed to allow him to pick up his property.

Mr. Neutz went with Bischoff to pick up the Property from Class A (the "November Pickup"). It took Mr. Neutz and Bischoff approximately one hour to load the parts into a 26-foot truck.

Goatley stored other property in the same building as Bischoff's Property at Class A, and even completed restorations where the 1966 Chevelle SS was stored. Mr. Browning was working on the restoration of another 1966 Chevelle at Class A in August 2017, around the time of Goatley's deposition in this matter. Goatley also currently has an unrestored white 1966 Chevelle at Class A. Other items of Bischoff's Property were stored behind other equipment and trailers.

Goatley has not returned the 1966 Chevelle SS or any of the parts needed to restore it. Goatley admitted he still has and can return, if ordered, the 1966 Chevelle SS and

396 engine block, bumpers, bumper brackets, a hood, some cylinder heads, and a crank for the vehicle.

Bischoff picked up certain items of Property during the November Pick Up and made a record of those returned items. Goatley would not allow Bischoff to get all his Property. Goatley admits he has certain unreturned items, consisting of the 1966 Chevelle SS and its parts . . . .

Goatley testified that in order to satisfy Bischoff's alleged obligation, he retained the 1966 Chevelle SS and its parts and title. Goatley did not give Bischoff these items of Property back when Bischoff went to Class A with the police.

Opinion at 1-7.

## ANALYSIS

Goatley raises two issues on appeal: whether the Trial Court erred by assessing punitive damages; and whether the Trial Court erred by denying a motion to strike Bischoff's proposed findings of fact. Because the appeal arises from a bench trial, we do not set aside the factual findings unless clearly erroneous, which happens when they are unsupported by substantial evidence. CR[1] 52.01; *Goshorn v. Wilson*, 372 S.W.3d 436, 439 (Ky. App. 2012). We give deference to the circuit court's factual findings if they are supported by substantial evidence, even if we would reach a contrary conclusion, because the circuit court "had the opportunity to observe, scrutinize, and assess the credibility of witnesses." *Bishop*

---

[1] Kentucky Rules of Civil Procedure.

*v. Brock*, 610 S.W.3d 347, 350 (Ky. App. 2020). We review *de novo* any "legal determinations and conclusions from a bench trial[.]" *Goshorn*, 372 S.W.3d at 439 (citing *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App. 2005)).

Neither party claims any error with the Trial Court's factual findings, and we have reviewed the trial and find the factual findings are supported by substantial evidence. We now conduct our *de novo* review of Goatley's claims that the Trial Court's legal determinations and conclusions were erroneous.

## I. Punitive Damages.

Goatley first argues that the Trial Court erred by assessing punitive damages. His argument is two-fold. First, Goatley claims that the Trial Court did not find that Goatley engaged in oppressive, wanton, malicious, or grossly negligent acts supporting punitive damages. Second, Goatley claims the Trial Court did not utilize the correct burden of proof, which is clear and convincing evidence.

Regarding punitive damages, the Trial Court concluded as follows:

The Court finds that Bischoff is entitled to recover punitive damages against Goatley. In an action for conversion, if the injury complained of is the result of deliberate and intentional wrongdoing, gross negligence, or recklessness on the part of the defendant, then punitive damages are recoverable. *See Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762-63 (Ky. 1974); [*Motors Ins. Corp. v.*] *Singleton*, 677 S.W.3d [309,] 315 [(Ky. App. 1984)]. As noted above, Bischoff has proven that Goatley deliberately and intentionally interfered with his

-8-

rights to possess, enjoy, and use his 1966 Chevelle SS, its parts, and its title based on false claims that he agreed to sell the 1966 Chevelle SS to him and that he is now entitled to storage fees for holding his property. Those facts meet the test for punitive damages. Based on the evidence in the record concerning the harm done to Bischoff, the Court finds that he is entitled to recover $15,000 in punitive damages, which is equal to half of the amount that Goatley offered to purchase the 1966 Chevelle SS.

. . .

(2) Plaintiff shall recover from Defendant punitive damages in the amount of $15,000.00 which is equal to half the amount that Defendant offered Plaintiff to purchase the 1966 Chevelle SS, to punish Defendant for his intentional, deliberate and ongoing wrongful withholding of Plaintiff's property without any right or entitlement to do so.

Order at 10, 12. The Trial Court also summarily denied a motion to alter, amend, or vacate the punitive damages award.

As previously noted, because this case involved a bench trial, we review factual determinations for clear error and substantial evidence, but we review legal determinations and conclusions *de novo*. A punitive damages claim can include both factual findings and legal conclusions, however, and, depending on the claim raised, may also involve the finder of fact's discretion. Accordingly, we must parse out the underlying claim to determine the metes and bounds of our appellate review.

-9-

The threshold issue of whether to assess punitive damages is a mixed question of law and fact that ultimately involves some discretion. Whether to grant punitive damages ultimately "requires consideration of not only the nature of the defendant's act, but also the extent of the harm resulting to the plaintiff." *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 412 (Ky. 1998) (citing *Fowler v. Mantooth*, 683 S.W.2d 250, 253 (Ky. 1984)). The facts supporting a punitive damages claim must be proven by clear and convincing evidence, and to be legally sufficient to justify a punitive damages award, those facts must demonstrate fraud, oppression, malice, or gross negligence. As our Supreme Court has summarized:

> Pursuant to KRS[2] 411.184(2), punitive damages are available if a plaintiff proves by clear and convincing evidence that a defendant acted with fraud, oppression, or malice. Punitive damages are also available if gross negligence is shown.

*Yung v. Grant Thornton, L.L.P.*, 563 S.W.3d 22, 65 (Ky. 2018) (citing *Williams v. Wilson*, 972 S.W.2d 260, 262-65 (Ky. 1998)).

If there is clear and convincing evidence that demonstrates fraud, oppression, malice, or gross negligence, then the ultimate decision to grant punitive damages becomes a discretionary function. *Moore v. Bothe*, 479 S.W.2d 634, 635 (Ky. 1972) ("It is the general rule of this Commonwealth that punitive

---

[2] Kentucky Revised Statutes.

-10-

damages are not recoverable as a matter of right and that the award of such damages rests within the discretion of the jury."). *Cf. Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (holding that in the context of an Unfair Claims Settlement Practices Act violation, "The jury's decision as to whether to award punitive damages remains discretionary because the nature of punitive damages is such that the decision is always a matter within the jury's discretion.").

If the trier of fact exercises its discretion and grants punitive damages, then any claims relating to excessive amounts or levels of punitive damages is subject to a *de novo* review. *See, e.g.*, *Ragland v. DiGiuro*, 352 S.W.3d 908, 916-17 (Ky. 2010) ("For these and other reasons, constitutional challenges to punitive damage awards are reviewed *de novo*."); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432-40, 121 S. Ct. 1678, 149 L. Ed. 2d 674 (2001) (stating that the level of punitive damages does not constitute a factual finding).

Accordingly, on the threshold issue of whether punitive damages should have been assessed, we are reviewing three elements with multiple standards of review: (1) whether the factual findings are clearly erroneous, which we review for substantial evidence; (2) whether those facts constituted clear and convincing evidence that support a finding that the defendant acted with fraud, oppression, malice, or gross negligence, which we review *de novo*; and (3) whether the ultimate decision to award punitive damages was within the realm of

permissible decisions, which we review for an abuse of discretion. *See, e.g.*, *Oberst v. Mounts*, No. 2019-CA-0136-MR, 2021 WL 1163912, *4 (Ky. App. Mar. 26, 2021) ("Here, the trial court, acting as the trier of fact at the bench trial, declined in its discretion to award punitive damages, and we will not second guess the trial court's discretion on this issue.").

Goatley's claim falls into the threshold category, namely that Bischoff allegedly did not prove by clear and convincing evidence an entitlement to punitive damages. Accordingly, we confine our review to the aforementioned three elements.

First, regarding the factual findings, we have already determined that they are supported by substantial evidence. Thus, we move to the second element in the analysis.

Goatley claims on this second element that there was no proof that he acted with fraud, oppression, malice, or gross negligence. He argues that the proof only showed that he committed the intentional tort of conversion, which would not, in and of itself, support a punitive damages claim. This argument on its face has some merit. Indeed, "[t]he principles governing when punitive damages should be permitted . . . have proved somewhat elusive and difficult to define." *Fowler v. Mantooth*, 683 S.W.2d 250, 252 (Ky. 1984). This difficulty arises because "Kentucky law does not limit punitive damages to specific torts." *PBI Bank, Inc.*

*v. Signature Point Condominiums LLC*, 535 S.W.3d 700, 726 (Ky. App. 2016). Notably, however, punitive damages may be awarded when the underlying tort is conversion, even though that tort is an intentional tort. *See, e.g.*, *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759 (Ky. App. 1974). Indeed, we necessarily look past the intentionality of the tort itself for punitive damages purposes, as "[t]he threshold for the award of punitive damages is misconduct involving something more than merely the commission of the tort." *Fowler*, 683 S.W.2d at 252. Punitive damages should "punish and discourage certain types of bad behavior[,]" and they should "deter future wrongdoing, and express . . . moral condemnation." *Yung*, 563 S.W.3d at 64 (citations omitted). In other words, the intentional tortfeasor can act with intentionality in the tortious act while simultaneously acting in a fraudulent, oppressive, malicious, or grossly negligent way toward the rights of the victim.

For example, in *Hensley*, 508 S.W.2d at 762, a case also involving conversion of an automobile, our former Court of Appeals held that the intentional tortfeasor acted "in such a way as would indicate a gross neglect or disregard for the rights of" the property owner. There, the tortfeasor intentionally sold the property owner's vehicle and all personal property therein within two hours of the property owner leaving his vehicle at the dealership and taking another car for a test drive. The tortfeasor did not wait to see if the property owner could obtain a

loan to purchase the new vehicle. Such facts constituted at least gross negligence toward the rights of the victim and permitted the imposition of punitive damages.

Similarly, in *Motors Insurance Corporation v. Singleton*, 677 S.W.2d 309, 315 (Ky. App. 1984), another case involving conversion of an automobile, punitive damages were permitted against an insurance company:

> [While] on notice as to the circumstances of the Singletons' purchase of the Corvette, and on notice that they had been deprived of its possession, that they had demanded its return and were refused, that they had sued both it and [the automobile dealer] and were thereby attempting to recover it or its value, nevertheless [the insurance company] deliberately and intentionally completed the conversion by selling it and reaping a profit. These facts certainly meet the test for punitive damages set forth in [W.] Prosser[, *Torts* § 2 (4th ed. 1971)] and in *Hensley v. Paul Miller Ford, Inc.*, *supra*. We agree with the Singletons that such flagrant action by [the insurance company] deserves the sting of punitive damages . . . .

Here, the Trial Court found punitive damages could be assessed because "Bischoff has proven that Goatley deliberately and intentionally interfered with his rights to possess, enjoy, and use his 1966 Chevelle SS, its parts, and its title based on *false claims* that he agreed to sell the 1966 Chevelle SS to him[.]" (emphasis added). This finding of fact and conclusion of law meets the *Hensley* and *Singleton* fraud, oppression, malice, or gross negligence standard.

The clear and convincing evidence adduced at trial, and delineated in the Trial Court's findings of fact, showed that Goatley's acts had an underlying

-14-

evil motive toward Bischoff and a gross neglect or disregard for Bischoff's rights. Goatley's misconduct was outrageous in character as he repeatedly refused to return Bischoff's property. *Cf. Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985). Bischoff unsuccessfully spent six months communicating with Goatley about returning the vehicle and parts. Bischoff then went with a police officer to Goatley's business to attempt to collect his property, and Bischoff's efforts to obtain his personal property were still rebuffed. Goatley also talked with Bischoff's intermediary, Neutz, and communicated that Goatley "would not return the 1966 Chevelle SS but would purchase it for $30,000[.]" Opinion at 5.

In fact, it was not until Bischoff obtained legal counsel, filed a lawsuit, and deposed Goatley that Goatley even allowed Bischoff to obtain all of Bischoff's other property that was being stored. Goatley still refused to return the 1966 Chevelle SS or any of its parts to Bischoff. As of the date of the bench trial, many years after the lawsuit's initiation, Goatley was still maintaining control of the 1966 Chevelle SS and its parts.

The clear and convincing evidence showed a gross neglect or disregard for Bischoff's property rights. If Goatley believed he had a valid contractual claim to purchase the vehicle, he could have returned it to Bischoff and filed his own lawsuit seeking specific performance and/or compensatory damages.

But Goatley did not even believe he had that much, as he argues in his Appellant's brief that "Bischoff had just agreed to negotiate the sale of this vehicle at some point in the future . . . ." Appellant's Brief at 8. Bischoff's multiple and repeated requests for the return of his property should have made it clear to Goatley that either the negotiations had failed, as Bischoff did not accept Goatley's offer of $30,000.00 to purchase the vehicle, or that Bischoff was not yet ready to sell the vehicle. Instead, Goatley spent years acting intentionally and outrageously toward Bischoff with a gross neglect of Bischoff's property rights. Goatley "deserves the sting of punitive damages[.]" *Singleton*, 677 S.W.2d at 315. The Trial Court properly held that the facts met the legal test for awarding punitive damages.

Goatley further argues that the Trial Court did not properly apply the clear and convincing evidence standard. He notes that the Trial Court did not use the words "clear and convincing evidence" in its Opinion. We find no basis for error when the burden of proof is not specifically noted in an order and judgment. Appellate courts routinely review orders and judgments under the proper burdens of proof, including the clear and convincing evidence standard. *See, e.g.*, *Norwich v. Norwich*, 459 S.W.3d 889 (Ky. App. 2015) (reviewing *de novo* trial court's judgment following bench trial to determine if ruling on fraud claim was supported by clear and convincing evidence); *Bishop v. Brock*, 610 S.W.3d 347 (Ky. App. 2020) (reviewing *de novo* trial court's judgment following bench trial to determine

-16-

if ruling on adverse possession claim was supported by clear and convincing evidence); *Vick v. Elliot*, 422 S.W.3d 277 (Ky. App. 2013) (same). We have thoroughly reviewed the Trial Court's ruling here and find it was supported by clear and convincing evidence. Thus, no reversible error occurred, and we affirm the award of punitive damages in this case.

## II. Motion to strike proposed findings of fact and conclusions of law.

Finally, Goatley argues the Trial Court abused its discretion when it denied his motion to strike Bischoff's proposed findings of fact and conclusions of law submitted after the bench trial. Bischoff created a transcript of the bench trial and cited to the transcript rather than the official video record. Goatley moved to strike the proposed findings of fact and conclusions of law, noting that the official video record is the proper citation source. Goatley alternatively requested that if the motion to strike were not granted, Bischoff "be required to resubmit the pleading with citations to the official record[.]" The Trial Court denied the motion and ordered Bischoff to refile with citations to the video record. Bischoff promptly complied.

Goatley argues on appeal that the Trial Court erred by not applying the then-applicable *appellate* rules of procedure and striking Bischoff's proposed findings of fact and conclusions of law. *See* CR 98; *Miller v. Armstrong*, 622 S.W.3d 661 (Ky. App. 2021). We disagree.

-17-

First, those rules are inapplicable to proposed findings of fact and conclusions of law submitted at the circuit court level. Second, "[t]he settled rule of appellate procedure is that a party is estopped from complaining of an error which he invited." *Wathen v. Mackey*, 300 Ky. 115, 187 S.W.2d 1000, 1004 (1945). Goatley requested the alternative relief, and the Trial Court granted it. Goatley cannot now claim error with his own requested relief. *Cf. Rankin v. Commonwealth*, 265 S.W.3d 227, 235 (Ky. App. 2007) (citing *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003)) ("When a defendant by his own action accepts the trial court's curative action as adequate by not requesting additional curative measures, the defendant cannot complain that the trial court erred.").

Accordingly, no reversible error occurred when the Trial Court granted Goatley's alternative relief.

## CONCLUSION

For many years, Goatley denied Bischoff the right to possess and enjoy Bischoff's personal property in an effort to get Bischoff to sell the property to Goatley. These actions as they related to Bischoff's rights went above and beyond the intentional tort of conversion. The Trial Court properly held that punitive damages were assessable under these facts. Likewise, the Trial Court did not err by granting Goatley's alternative request in his motion to strike.

-18-

Accordingly, we AFFIRM the Trial Court's Findings of Fact,

Conclusions of Law, and Judgment.


ALL CONCUR.


BRIEFS FOR APPELLANTS:

David B. Blandford
Michael A. Augustus
Louisville, Kentucky

BRIEF FOR APPELLEE:

R. Kenyon Meyer
Elizabeth H. Lawrence
Louisville, Kentucky